**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) PRODUCTS LIABILITY LITIGATION | MDL NO. 3094<br><br>THIS DOCUMENT RELATES TO ALL CASES<br><br>JUDGE KAREN SPENCER MARSTON |
| KARENA HERRON,<br><br>    Plaintiff,<br><br>v.<br><br>NOVO NORDISK A/S and<br>NOVO NORDISK INC.,<br><br>    Defendants. | COMPLAINT AND JURY DEMAND<br>CIVIL ACTION NO.:<br><br>    _____ |

**SHORT FORM COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff named below, by and through the undersigned counsel, files this *Short-Form Complaint and Demand for Jury Trial* against the Defendants selected below. Plaintiff adopts and incorporates by reference the allegations, claims, and the relief sought in Plaintiffs' *Amended Master Long Form Complaint and Demand for Jury Trial (ECF 481) ("Master Complaint")*, and any subsequent amended versions of such Master Complaint, filed in *In Re: Glucagon-Like Peptide-1 Receptor Agonists (GLP-1 RAs) Products Liability Litigation*, MDL No. 3094 in the United States District Court for the Eastern District of Pennsylvania, as it relates to the selected Defendants and Causes of Action. Plaintiff files this *Short-Form Complaint* as permitted by Case Management Order ("CMO") No. 27 (ECF 503).

1

## IDENTIFICATION OF PARTIES

**Plaintiff**

1.      Full (first, middle, and last) name of Plaintiff injured due to use of GLP-1 RA Product(s): ___Karena Herron_____ .

2.      If applicable, full name(s) and representative capacity of Plaintiff alleging wrongful death claim: _____ , as _____ of the estate of _____ , deceased.

3.      If applicable, full name(s) of Plaintiff(s) alleging survival claims, as permitted under state law(s): _____ .

4.      If applicable, full name(s) of Plaintiff(s) alleging loss of consortium or loss of services: _____ .

**Defendants**

5.      Plaintiff is suing the following Defendants (check all that apply):

    **X**____ Novo Nordisk Inc.

    **X**____ Novo Nordisk A/S

    _____ Eli Lilly and Company

    _____ Lilly USA, LLC

    _____ other(s) (identify): _____

## JURISDICTION AND VENUE

6.      City and state of Plaintiff's current residence (or in a case brought on behalf of a Decedent, Decedent's last permanent residence):

_____Fremont, Nebraska_____

7.      State where Plaintiff was prescribed the GLP-1RA Product at issue:

_____Nebraska_____

8.      State of Plaintiff's residence at time of their use of the GLP-1RA Product at issue:

_____Nebraska_____

9.      City and state of Plaintiff's residence at time of diagnosis of injury:

_____Fremont, Nebraska_____

10.     Jurisdiction is based on:

__X__    diversity of citizenship pursuant to 28 U.S.C. § 1332

_____    other (plead in sufficient detail as required by applicable rules):

_____

_____

11.     The District Court where Plaintiff might have otherwise filed this Short Form Complaint, absent this Court's CMO No. 14, and/or to where remand could be ordered:

District of Nebraska

12.     Venue is proper in the District Court identified in Paragraph 11 because:

__X__    a substantial part of the events and omissions giving rise to Plaintiff's

         claims occurred there

3

X____ other (plead in sufficient detail as required by applicable rules): Plaintiff currently resides in Fremont, Nebraska, and Plaintiff purchased

and used Defendants' products in Fremont, Nebraska.

13.    If applicable, identify the citizenship of any additional Defendants named above:

_____

4

## **PRODUCT USE**

14.    Plaintiff used the following GLP-1 RA Product for which claims are being asserted in this case (check all that apply):

X    Ozempic (semaglutide)

_____    Wegovy (semaglutide)

X    Rybelsus (oral semaglutide)

_____    Victoza (liraglutide)

_____    Saxenda (liraglutide)

_____    Trulicity (dulaglutide)

_____    Mounjaro (tirzepatide)

_____    Zepbound (tirzepatide)

_____    Other(s) (specify): _____

15.    To the best of Plaintiff's knowledge, Plaintiff used GLP-1 RA Products during the following approximate date range (month(s) and year(s)) (if multiple products, specify date range(s) for each product):

Plaintiff used Rybelsus between approximately May 2022 and September 2022.

Plaintiff used Ozempic between approximately December 2022 and January 2023.

## INJURIES AND DAMAGES

16.    To the best of Plaintiff's knowledge, as a result of using GLP-1 RA Products,

Plaintiff suffered the following injuries, including their sequelae (check all that apply):

X_____ Gastroparesis

_____ Other gastro-intestinal injuries (specify) _____

_____Ileus

_____Ischemic Bowel/Ischemic Colitis

_____Intestinal Obstruction

_____Necrotizing Pancreatitis

_____Gallbladder Injury (specify) _____

_____Micronutrient Deficiency

_____Wernicke's encephalopathy

_____Aspiration

_____Death

_____Additional/Other(s) (specify): _____

17.    Plaintiff's  injuries occurred in approximately (month and year)?

**Plaintiff's injuries occurred in approximately December 2023.**
_____

_____

_____

_____

6

18.     In addition, as a result of Plaintiff's use of GLP-1 RA Products, Plaintiff suffered personal and economic injuries, pain and suffering, emotional distress, mental anguish, and the following damages (check all that apply):

X_____ Injury to self

_____ Injury to person represented

X_____ Economic loss

_____ Wrongful death

_____ Survivorship

_____ Loss of services

_____ Loss of consortium

_____ other(s) (specify): _____

7

## CAUSES OF ACTION

19.    In addition to adopting and incorporating by reference the Master Complaint as stated above, more specifically, Plaintiff hereby adopts and incorporates by reference the following Causes of Action and allegations asserted in the Master Complaint (check all that apply):

X     Count I:     Failure to Warn – Negligence

_____ Count II:     Failure to Warn – Strict Liability

_____ Count III:     Breach of Express Warranty/Failure to Conform to Representations

_____ Count IV:     Breach of Implied Warranty

X     Count V:     Fraudulent Concealment/Fraud by Omission

X     Count VI:     Fraudulent/Intentional Misrepresentation

X     Count VII:     Negligent Misrepresentation/Marketing

_____ Count VIII: Strict Product Liability Misrepresentation/Marketing

_____ Count IX:     Innocent Misrepresentation/Marketing

X     Count X:     Unfair Trade Practices/Consumer Protection (see below)

X     Count XI:     Negligence

_____ Count XII:     Negligent Undertaking

X     Count XIII: State Product Liability Act (see below)

_____ Count XIV: Wrongful Death

_____ Count XV:     Loss of Consortium

_____ Count XVI: Survival Action

_____ Other(s) (specify, and on separate pages, plead additional facts supporting any above claim in sufficient detail as required by applicable rules):

_____

_____

_____

_____

20.     If Plaintiff is asserting a claim pursuant to the unfair trade practices or

consumer protection statutes of any jurisdiction as identified in Count X above:*

    a.   Indicate the specific statute (including subsections) under which Plaintiff

       is bringing such claims:

         **Neb. Rev. Stat. Ann. § 87-302**
_____

_____

    b.   Identify the factual allegations supporting those claims (by subsection, if

       applicable):

       **See Attachment 1.**
_____

_____

_____

*Plaintiffs asserting any such claims are on notice that "failure to identify [these claims] with the requisite specificity will result in the short form complaint being stricken with only one opportunity to amend." Opinion (ECF 465) at 74 n.33.*

21.     If Plaintiff is asserting a claim pursuant to the Product Liability Act

("PLA") of any jurisdiction as identified in Count XIII above:*

    a.   Indicate the specific statute (including subsections) under which Plaintiff

       is bringing such claims:

**Neb. Rev. St. § 25-21-180; Neb. Rev. St. § 25-21-181; Neb. Rev. St. § 25-21-182; Neb. U.C.C. § 2-313; Neb. U.C.C. § 2-314.**

    b.   Identify the legal theories identified in Paragraph 19 above (*e.g.*, negligent

       failure to warn, fraud, etc.) that are subsumed within Plaintiff's PLA claim:

**Breach of Express Warranty, Breach of Implied Warranty**

**Failure to Warn - Negligence, Failure to Warn - Strict Liability), Negligent**

**Misrepresentation**

    c.   Identify the factual allegations supporting those claims:

**See, e.g., ¶¶ 675-698 of the Master Complaint (Breach of Express Warranty); ¶¶ 699-720 of the Master Complaint (Breach of Implied Warranty); ¶¶ 606-640 of the Master Complaint (Failure to Warn - Negligence); ¶¶ 641-674 of the Master Complaint (Failure to Warn – Strict Liability); ¶¶ 801-824 of the Master Complaint (Negligent Misrepresentation) incorporated herein by reference.**

*\* Plaintiffs asserting any such PLA claims are on notice that "failure to identify the PLA claims with the requisite specificity will result in the short form complaint being stricken with only one opportunity to amend." Opinion (ECF 465) at 76 n.35.*

22.     If pre-suit notice is required by statute, did Plaintiff provide some form of

separate pre-suit notice to Defendants? **Yes         **.   If so, attach such notice. **See**

**Attachment 2.**

## RELIEF

Plaintiff prays for relief and judgment against Defendants of compensatory damages, punitive and/or exemplary damages, interest, costs, attorneys' fees, and such further relief as the Court deems equitable and just, and as set forth in the *Master Complaint*, as appropriate, and any additional relief to which Plaintiff may be entitled.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all claims triable by jury in this action.

Date: May 12, 2026

By:

/s/ Virginia E. Anello
Virginia E. Anello (VA-8197)
Douglas & London, P.C.
935 Gravier Street, Suite 2120
New Orleans, LA 70112
Ph: 212-566-7500
Fax: 212-566-7501
Email: vanello@douglasandlondon.com
Attorney for Plaintiff

**ATTACHMENT "1"**

<u>**UNFAIR TRADE PRACTICES / CONSUMER PROTECTION SUPPLEMENT**</u>

1.      Plaintiff incorporates by reference the factual allegations in the Master Complaint and its paragraphs 850-65 as though set forth fully at length herein.

2.      Plaintiff brings this claim against the Defendant(s) identified in paragraph 5 of the Short Form Complaint ("Defendant(s)").

3.      Plaintiff brings this claim under the statute, and relevant subsections, identified in Paragraph 20(a) of the Short Form Complaint (the "Statute").

4.      The Nebraska Uniform Deceptive Trade Practices Act ("Nebraska UDTPA" or the "Statute") makes it unlawful for a person to engage in a deceptive practice "in the course of his or her business, vocation, or occupation." Neb. Rev. Stat. Ann. § 87-302.

5.      Plaintiff and/or Defendants are "persons" under the Statute.

6.      Plaintiff is a consumer who purchased one or more GLP-1 RA Products for personal, family, and/or household purposes.

7.      Defendant(s) are the suppliers, manufacturers, advertisers, and/or sellers of the GLP-1 RA Products, subject to liability under the Statute for fraudulent, unfair, deceptive, and unconscionable consumer sales practices.

8.      Defendant(s) designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed the GLP-1 RA Products into the stream of commerce, and therefore owed not only a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiff, but also separate and independent statutory duties to be truthful, fair, accurate, and to not mislead or deceive consumers in connection with the sale of GLP-1 RA Products.

9.   Defendant(s) marketed and advertised the GLP-1 RA Products to consumers, physicians, and other healthcare entities in Nebraska. In addition, Defendant(s) sold the GLP-1 RA Products to residents of Nebraska; shipped GLP-1 RA Products to Nebraska; and otherwise engaged in trade or commerce, or conducted business, related to the GLP-1 RA Products in Nebraska. Defendant(s)' misconduct described herein significantly affected Nebraska consumers.

10.   As alleged in the Master Complaint, Defendant(s) engaged in unfair competition or unfair, deceptive, misleading, false, fraudulent, or unconscionable acts or practices in violation of the Statute by, among other things:

   a.   Misleading consumers regarding the safety risks associated with use of their GLP-1 RA Products and overstating the weight-loss benefits and understating risks from using the GLP-1 RA Products;

   b.   Excessively advertising, marketing and overpromoting their GLP-1 RA Products, including turbo-charging the pre-existing extensive direct-to-consumer marketing campaign with use of telehealth providers and promoting the drugs off-label; and

   c.   Failing to disclose that they performed research and testing in a manner that would lead to under-reporting of the severe risks of using the GLP-1 RA Products.

11.   As described in the Master Complaint, including in the paragraphs cited in paragraph 856 of the Master Complaint as well as paragraphs 447 through 576 of the Master Complaint, at all relevant times, Defendant(s) knew or should have known, including from preclinical trials, premarket clinical trials, post-market surveillance, adverse event reports, and published scientific papers, that the GLP-1 RA Products posed serious health risks to users. Despite this knowledge, Defendant(s) continued to mislead consumers by omitting, understating, or downplaying risks associated with use of their GLP-1 RA Products.

12.   As described in the Master Complaint, including in paragraphs 577 through 601 of the Master Complaint, at all relevant times, Defendant(s) knew or should have known that their

2

GLP-1 RA Products are not as effective for weight loss as Defendant(s) claimed. Despite espousing significant weight-loss benefits, Defendant(s) knew that the average person loses only a small percentage of their body weight while on GLP-1 RA Products, a significant percentage of patients experience minimal to no weight loss, many people stop taking GLP-1 RA Products relatively quickly, and many people who discontinue use gain back as much as — or more than — the weight they lost while using the GLP-1 RA Products. Despite this knowledge, Defendant(s) continued to mislead consumers by overstating the products' weight-loss benefits.

13.    The information referenced above that Defendant(s) misrepresented, concealed and did not disclose, was material. A reasonable person, including Plaintiff, would find that information, which was related to their health and well-being, such as the serious adverse health risks associated with the use of the GLP-1 RA Products and the limits of the products' efficacy, to be important when deciding whether to purchase and/or use the GLP-1 RA Products.

14.    Defendant(s) intentionally concealed the foregoing material information from consumers, users, prescribers, physicians and other health care providers, including Plaintiff and Plaintiff's health care providers, because to do otherwise would have resulted in fewer prescriptions written for, and fewer purchases of, the GLP-1 RA Products.

15.    Defendant(s) violated the Statute by failing to disclose the material health and safety information regarding the GLP-1 RA Products discussed above to consumers, users, physicians, health care providers and others, including Plaintiff and Plaintiff's health care providers, in any of Defendant(s)' marketing and promotional materials, advertising, packaging, labeling, websites, and/or any other public communication.

16.    Defendant(s) violated the Statute by making numerous representations about the weight-loss benefits of taking GLP-1 RA Products while concealing additional information related

to the purported weight-loss benefits from consumers, users, physicians, health care providers and others, including Plaintiff and Plaintiff's health care providers, in any of Defendant(s)' marketing and promotional materials, advertising, packaging, labeling, websites, and/or any other public communication.

17.   Defendant(s) knew that the misrepresentations, omissions and concealment of material safety and efficacy information in the GLP-1 RA Products' packaging, labels, advertisements, promotional materials, websites, and other communications and disclosures rendered them false, deceptive, inadequate, and misleading.

18.   By consistently and pervasively understating the risk and overstating the benefits of taking GLP-1 RA Products, Defendant(s) engaged in unfair, deceptive and/or fraudulent acts in violation of the statute by, among other things:

(a) representing that the GLP-1 RA Products have characteristics, uses, or benefits that they do not have; (b) representing that the GLP-1 RA Products are of a particular standard, quality, or grade, when they are not; (c) advertising goods or services with intent not to sell them as advertised; and (d) engaging in unconscionable acts or practices in connection with a consumer transaction. Neb. Rev. Stat. § 87-302(a)(5), (8), (10); § 87-303.1.

19.   In violation of the Statute, Defendant(s)' conduct described herein constitutes the knowing and willful act, use, or employment of deception, false promise, misrepresentation, and unfair practices, and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of goods, merchandise and/or consumer merchandise (i.e., the GLP-1 RA Products), in trade or commerce, and was done with the intention that consumers such as Plaintiff would rely upon such conduct in purchasing or using the GLP-1 RA Products.

4

20. Defendant(s)' conduct was fraudulent and deceptive because the material misrepresentations and omissions had the capacity or tendency to deceive and, in fact, did deceive reasonable consumers, including Plaintiff.

21. Plaintiff justifiably relied on Defendant(s)' misrepresentations and omissions and if Plaintiff had known the information that Defendant(s) withheld and concealed, Plaintiff would not have purchased or used the GLP-1 RA Products.

22. As a result of such deceptive packaging, labels, advertisements, promotional materials, websites, and other communications and disclosures, Plaintiff purchased and/or used the GLP-1 RA Products in justifiable and reasonable reliance on Defendant(s) misrepresentations and omissions. Defendant(s) expected or should have expected reasonable consumers to rely on these misrepresentation and omissions, in part, because the omitted information directly relates to consumers' health and well-being.

23. Plaintiff at all times acted as a reasonable consumer in relying upon Defendant(s)' misrepresentations and material omissions concerning Defendants' GLP-1 Products in choosing to purchase and/or consume the GLP-1 RA Products prescribed by their health care provider.

24. The actions and omissions of Defendant(s) are uncured or incurable.

25. As alleged above, Defendant(s) had actual knowledge of the defective and dangerous condition of the GLP-1 RA Products and failed to take any action to cure those conditions.

26. As a direct and proximate result of Defendant(s)' misconduct described herein, Plaintiff has suffered serious injuries, economic and non-economic losses, and other damages, all of which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence, including those set forth in paragraphs 16 to 18 in the Short Form Complaint.

Accordingly, pursuant to the Statute, Plaintiff seeks to recover any and all damages and/or remedies available to Plaintiff under the law, including but not limited to fees, costs, and any and all equitable relief this Court may deem appropriate.

# ATTACHMENT 2

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

JACLYN BJORKLUND,

     *Plaintiff,*

v.

NOVO NORDISK A/S, NOVO NORDISK
NORTH AMERICA OPERATIONS A/S,
NOVO NORDISK US HOLDINGS INC.,
NOVO NORDISK US COMMERCIAL
HOLDINGS INC., NOVO NORDISK INC.,
NOVO NORDISK RESEARCH CENTER
SEATTLE, INC., NOVO NORDISK
PHARMACEUTICAL INDUSTRIES LP,
and ELI LILLY AND COMPANY,

     *Defendants.*

Case No. _____

Judge _____

JURY TRIAL DEMANDED

### COMPLAINT AND DEMAND FOR JURY TRIAL

--------------------------------------------------------------------------------------------------------------

Plaintiff, JACLYN BJORKLUND, by her attorneys, MORGAN & MORGAN, upon information and belief, at all times hereinafter mentioned, alleges as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to the Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because Defendants are incorporated and have their principal places of business in states other than the state in which the named Plaintiff resides, which is Louisiana.

2. This Court has personal jurisdiction over Defendants, consistent with the United States Constitution and LA R.S. 13:3201 (Louisiana's "long arm" statute), as Plaintiff's claims

1

arise out of Defendants' transaction of business and the tortious acts within the State of Louisiana, and by virtue of Defendants' substantial, continuous, and systematic contacts with the State of Louisiana unrelated to Plaintiff's claims.

## NATURE OF THE CASE

3. This is an action for damages suffered by Plaintiff, JACLYN BJORKLUND, who was severely injured as a result of her use of Ozempic and Mounjaro, two injectable prescription medications that are used to control blood sugar in adults with type 2 diabetes.

4. Ozempic is also known as semaglutide. Ozempic works by stimulating insulin production and reducing glucose production in the liver helping to lower blood sugar levels.

5. Mounjaro is also known as tirzepatide. Mounjaro works by targeting the body's receptors for GIP (glucose-dependent insulinotropic polypeptide) and GLP-1 (glucagon-like peptide-1).

6. Ozempic and Mounjaro belong to a class of drugs called GLP-1 receptor agonists.

7. Defendants acknowledge that gastrointestinal events are well known side effects of the GLP-1 class. However, Defendants have downplayed the severity of the gastrointestinal events caused by Ozempic and Mounjaro, never, for example, warning of the risk of gastroparesis ("paralyzed stomach")[1] or gastroenteritis.

8. Gastroparesis is a condition that affects normal muscle movement in the stomach. Ordinarily, strong muscular contractions propel food through the digestive tract. However, in a person suffering from gastroparesis, the stomach's motility is slowed down or does not work at

---

[1] Mounjaro's label mentions gastroparesis without warning of the risk; rather, it states that Mounjaro "has not been studied" in patients with gastroparesis or other severe gastrointestinal disease, "and is therefore not recommended in these patients[,]" and it lists gastroparesis among other medical conditions for patients to discuss with their healthcare providers. https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=d2d7da5d-ad07-4228-955f-cf7e355c8cc0.

all, preventing the stomach from emptying properly. Gastroparesis can interfere with normal digestion, cause nausea, vomiting, abdominal pain, abdominal bloating, severe dehydration, a feeling of fulness after eating just a few bites, vomiting undigested food, undigested food that hardens and remains in the stomach, acid reflux, changes in blood sugar levels, lack of appetite, weight loss, malnutrition, and a decreased quality of life. There is no cure for gastroparesis.[2]

9.     Gastroenteritis refers to inflammation of the stomach and intestines. While viral gastroenteritis is also known as stomach flu, gastroenteritis may also be caused by ingesting medications.[3] Its symptoms include vomiting, nausea, diarrhea, stomach cramps, muscle aches, headaches, and fever.[4] Notably, vomiting and diarrhea can cause dehydration, which is the main complication of gastroenteritis, and which can lead to death.[5]

**PARTY PLAINTIFF**

10.     Plaintiff, JACLYN BJORKLUND, is a citizen of the United States, and is a resident of the State of Louisiana.

11.     Plaintiff was born on September 5, 1978.

12.     Plaintiff used Ozempic for more than one year stopping use in or around July 2023, at which point she began using Mounjaro.

13.     Plaintiff's physician(s) (collectively "prescribing physician(s)") prescribed both Ozempic and Mounjaro that was used by Plaintiff.

---

[2] https://www.mayoclinic.org/diseases-conditions/gastroparesis/symptoms-causes/syc-20355787 (last visited on 8/1/23).
[3] https://www.merckmanuals.com/home/digestive-disorders/gastroenteritis/drug-related-gastroenteritis-and-chemical-related-gastroenteritis
[4] https://www.mayoclinic.org/diseases-conditions/viral-gastroenteritis/symptoms-causes/syc-20378847 (last visited on 8/1/23).
[5] https://www.mayoclinic.org/diseases-conditions/viral-gastroenteritis/symptoms-causes/syc-20378847 (last visited on 8/1/23).

14.     As a result of using Defendants' Ozempic and Mounjaro, Plaintiff was caused to suffer from severe gastrointestinal events, and as a result sustained severe and permanent personal injuries, pain, suffering, and emotional distress, and incurred medical expenses.

15.     As a result of using Defendants' Ozempic and Mounjaro, Plaintiff was caused to suffer from severe gastrointestinal events, which resulted in, for example, severe vomiting, stomach pain, gastrointestinal burning, being hospitalized for stomach issues on several occasions including visits to the emergency room, teeth falling out due to excessive vomiting, requiring additional medications to alleviate her excessive vomiting, and throwing up whole food hours after eating.

16.     Plaintiff's injuries were caused by Defendants' Ozempic and Mounjaro.

## PARTY DEFENDANTS

17.     Defendant Novo Nordisk Inc. is a Delaware corporation with a principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey.

18.     Upon information and belief, Defendant Novo Nordisk Inc. is wholly owned by Defendant Novo Nordisk US Commercial Holdings, Inc.

19.     Upon information and belief, Defendant Novo Nordisk US Commercial Holdings Inc. is a Delaware corporation with a principal place of business at 103 Foulk Road, Wilmington, Delaware.

20.     Upon information and belief, Defendant Novo Nordisk US Commercial Holdings Inc. is wholly owned by Defendant Novo Nordisk US Holdings Inc.

21.     Upon information and belief, Defendant Novo Nordisk US Holdings Inc. is a Delaware corporation with a principal place of business at 103 Foulk Road, Wilmington, Delaware.

4

22.     Upon information and belief, Defendant Novo Nordisk US Holdings Inc. is wholly owned by Defendant Novo Nordisk A/S.

23.     Defendant Novo Nordisk A/S is a public limited liability company organized under the laws of Denmark with a principal place of business in Bagsværd, Denmark.

24.     Defendant Novo Nordisk A/S and its subsidiaries and affiliates named herein are collectively referenced as "the Novo Nordisk Defendants."

25.     Defendant Novo Nordisk North America Operations A/S is a company organized under the laws of Denmark with a principal place of business in Bagsværd, Denmark.

26.     Novo Nordisk Research Center Seattle, Inc. is a Delaware corporation with a principal place of business at 530 Fairview Ave. N., Seattle, Washington.

27.     The Novo Nordisk Defendants' website states that Novo Nordisk's Seattle research center "serves as the foundation of the company's U.S. research and development efforts for diabetes, obesity, liver disease and other therapeutic areas."[6]

28.     Novo Nordisk Pharmaceutical Industries LP is a Delaware corporation with a principal place of business at 3611 and 3612 Powhatan Road, Clayton, North Carolina.

29.     The Novo Nordisk Defendants' website states that "the vast majority of our U.S. injectable diabetes and obesity products are produced and packaged at the Clayton aseptic fill-finish site."[7] Upon information and belief, this refers to Novo Nordisk's manufacturing facility in Clayton, North Carolina, operated by Novo Nordisk Pharmaceutical Industries LP.

30.     Defendant Novo Nordisk Pharmaceutical Industries LP is the labeler for Ozempic, and Defendants Novo Nordisk A/S and Novo Nordisk Inc. are identified on Ozempic's label.[8] The

---

[6] https://www.novonordisk-us.com/about/who-we-are/seattle-wa.html (last visited on 8/1/23).
[7] https://www.novonordisk-us.com/about/who-we-are/north-carolina.html (last visited on 8/1/23).
[8] https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=adec4fd2-6858-4c99-91d4-531f5f2a2d79 (last visited on 8/1/23).

5

Novo Nordisk Defendants also designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed Ozempic.

31. Defendant Eli Lilly and Company ("Eli Lilly") is an Indiana corporation with a principal place of business at 893 S. Delaware St., Indianapolis, Indiana.

32. Eli Lilly designed, researched, manufactured, tested, labeled, advertised, promoted, marketed, sold, and/or distributed Mounjaro and is identified on its label.[9]

## **FACTUAL BACKGROUND**

### A. FDA's Approval of Ozempic and Mounjaro

33. On December 5, 2016, the Novo Nordisk Defendants announced submission of a new drug application (NDA) to the FDA for regulatory approval of once-weekly injectable semaglutide, a new glucagon-like peptide-1 (GLP-1) medication for treatment of type 2 diabetes. In the announcement, Defendants represented that in clinical trials "once-weekly semaglutide had a safe and well tolerated profile with the most common adverse event being nausea."[10]

34. On December 5, 2016, Defendant Novo Nordisk Inc. submitted NDA 209637, requesting that the FDA grant it approval to market and sell Ozempic (semaglutide) 0.5 mg or 1 mg injection in the United States as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus. On December 5, 2017, the FDA approved NDA 209637.[11]

35. On March 20, 2019, Defendant Novo Nordisk Inc. submitted supplemental new drug application (sNDA) 209637/S-003 for Ozempic (semaglutide) 0.5 mg or 1 mg injection, requesting approval to expand its marketing of Ozempic by adding an indication to reduce the risk

---

[9] https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=d2d7da5d-ad07-4228-955f-cf7e355c8cc0 (last visited on 8/1/23).

[10] https://ml.globenewswire.com/Resource/Download/d2f719e1-d69f-4918-ae7e-48fc6b731183 (last visited on 8/1/23).

[11] https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/209637s000ltr.pdf (last visited on 8/1/23).

of major adverse cardiovascular events in adults with type 2 diabetes and established cardiovascular disease.[12] On January 16, 2020, the FDA approved sNDA 209637/S-003.[13]

36. On May 28, 2021, Defendant Novo Nordisk Inc. submitted sNDA 209637/S-009, requesting approval for a higher 2 mg dose of Ozempic (semaglutide) injection. On March 28, 2022, the FDA approved sNDA 209637/S-009.[14]

37. On March 28, 2022, the Novo Nordisk Defendants announced the FDA's approval of sNDA 209637/S-009 for a higher 2 mg dose of Ozempic (semaglutide) injection. In the press release, Defendants represented Ozempic as having "proven safety and efficacy" and advertised that "plus it can help many patients lose some weight."[15] As with its prior press releases, Defendants disclosed Important Safety Information and a provided link to the Medication Guide and Prescribing Information, but severe gastrointestinal events including gastroparesis and gastroenteritis were not identified as risks.

38. On September 14, 2021, Eli Lilly submitted NDA 215866 Mounjaro (tirzepatide) injection as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus. On May 13, 2022, the FDA approved NDA 215866.[16]

39. On May 13, 2022, Eli Lilly announced the FDA's approval of NDA 215866 Mounjaro (tirzepatide) injection as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes. In the press release, Eli Lilly disclosed a safety summary and provided

---

[12] https://www.prnewswire.com/news-releases/novo-nordisk-files-for-us-fda-approval-of-oral-semaglutide-for-blood-sugar-control-and-cardiovascular-risk-reduction-in-adults-with-type-2-diabetes-300815668.html (last visited on 8/1/23).

[13] https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2020/209637Orig1s003ltr.pdf (last visited on 8/1/23).

[14] https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/209637Orig1s009ltr.pdf (last visited on 8/1/23).

[15] https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-higher-dose-ozempic-2-mg-providing-increased-glycemic-control-for-adults-with-type-2-diabetes-301512209.html (last visited on 8/1/23).

[16] https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/215866Orig1s000ltr.pdf (last visited on 8/1/23).

a link to the Medication Guide and Prescribing Information, but severe gastrointestinal events including gastroparesis and gastroenteritis were not identified as risks.

**B. Defendants' Marketing and Promotion of Ozempic and Mounjaro**

40. On December 5, 2017, the Novo Nordisk Defendants announced the FDA's approval of Ozempic (semaglutide) 0.5 mg or 1 mg injection in a press release stating that: "Novo Nordisk expects to launch OZEMPIC® in the U.S. in Q1 2018, with a goal of ensuring broad insurance coverage and patient access to the product. OZEMPIC® will be priced at parity to current market-leading weekly GLP-1 receptor agonists and will be offered with a savings card program to reduce co-pays for eligible commercially-insured patients. Additionally, as part of the access strategy, Novo Nordisk is working with appropriate health insurance providers to establish innovative contracting solutions."[17]

41. On February 5, 2018, the Novo Nordisk Defendants announced that they had started selling Ozempic in the United States and touted the medication as a "new treatment option[]" that "addresses the concerns and needs of people with diabetes[.]" The Novo Nordisk Defendants offered an "Instant Savings Card to reduce co-pays to as low as $25 per prescription fill for up to two years."[18]

42. The Novo Nordisk Defendants promoted the safety, efficacy and sale of Ozempic in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, and through other public outlets.

43. On July 30, 2018, the Novo Nordisk Defendants launched their first television ad for Ozempic to the tune of the 1970s hit pop song "Magic" by Pilot wherein the Novo Nordisk

---

[17] https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-ozempic-semaglutide-injection-for-the-treatment-of-adults-with-type-2-diabetes-300567052.html (last visited on 8/1/23).
[18] https://www.prnewswire.com/news-releases/novo-nordisk-launches-ozempic-and-fiasp-expanding-treatment-options-for-adults-with-diabetes-300592808.html (last visited on 8/1/23).

Defendants advertised that "adults lost on average up to 12 pounds" when taking Ozempic, even though it is not a weight loss drug.[19]

44. Over the next five years, the Novo Nordisk Defendants spent $884,000,000 on running television ads in the United States to promote its semaglutide drugs (Ozempic, Wegovy and Rybelsus) with the majority of the spending allocated specifically to advertising Ozempic.[20]

45. On July 6, 2023, it was reported that the Novo Nordisk Defendants had spent $11,000,000 on food and travel for doctors as part of the Novo Nordisk Defendants' efforts to promote Ozempic.[21]

46. As a result of the Novo Nordisk Defendants' advertising and promotion efforts, Ozempic has been widely used throughout the United States. The number of prescriptions filled reached an all-time high of 373,000 in one week in February of 2023, with more than half of those being new prescriptions.[22] In June 2023, it was reported that new prescriptions for Ozempic had surged by 140 percent from the prior year.[23]

47. On TikTok, the hashtag #Ozempic had 273 million views as of November 22, 2022,[24] and currently has over 1.2 billion views.[25]

48. On June 15, 2023, a news report was published about the "thousands of weight-loss ads on social media for the drugs Ozempic and Wegovy." And while many of those ads were found to be from online pharmacies, as of June of 2023 the Novo Nordisk Defendants were still running

---

[19] https://www.ispot.tv/ad/d6Xz/ozempic-oh (last visited on 8/1/23).
[20] https://medwatch.com/News/Pharma___Biotech/article15680727.ece (last visited on 8/1/23).
[21] https://finance.yahoo.com/video/novo-nordisk-spent-11-million-155418308.html (last visited on 8/1/23).
[22] https://www.cnn.com/2023/03/17/health/ozempic-shortage-tiktok-telehealth/ (last visited on 8/1/23).
[23] https://www.washingtonpost.com/business/2023/06/11/weight-loss-ozempic-wegovy-insurance/ (last visited on 8/1/23).
[24] https://www.nytimes.com/2022/11/22/well/ozempic-diabetes-weight-loss.html (last visited on 8/1/23).
[25] https://www.tiktok.com/tag/ozempic (last visited on 8/1/23).

online social-media ads for its semaglutide products despite claiming in May that it would stop running ads due to a shortage of the drug.[26]

49.     On July 10, 2023, a global media company declared Ozempic as "2023's buzziest drug" and one of the "Hottest Brands, disrupting U.S. culture and industry."[27]

50.     At all relevant times, the Novo Nordisk Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and/or distribute Ozempic.

51.     On May 13, 2022, Eli Lilly announced approval of Mounjaro, proclaiming "Mounjaro's safety and efficacy in a broad range of adults with type 2 diabetes."[28]

52.     At all relevant times, Eli Lilly was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and/or distribute Mounjaro.

53.     On October 6, 2022, Eli Lilly announced that the FDA had "granted Fast Track designation for the investigation of tirzepatide" to treat obese or overweight adults.[29]

54.     According to a recent publication, in fall 2022, analysts at UBS projected that Mounjaro could reach peak sales of $25 billion, asserting Eli Lilly's position in the multibillion-dollar obesity market.[30]

---

[26] https://www.nbcnews.com/tech/internet/ozempic-weight-loss-drug-ads-instagram-wegovy-semaglutide-rcna88602 (last visited on 8/1/23).

[27]     https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571 (last visited on 8/1/23).

[28] https://www.prnewswire.com/news-releases/fda-approves-lillys-mounjaro-tirzepatide-injection-the-first-and-only-gip-and-glp-1-receptor-agonist-for-the-treatment-of-adults-with-type-2-diabetes-301547339.html (last visited on 8/1/23).

[29] https://investor.lilly.com/news-releases/news-release-details/lilly-receives-us-fda-fast-track-designation-tirzepatide (last visited on 8/1/23).

[30] https://www.biospace.com/article/eli-lilly-and-novo-nordisk-face-off-in-lucrative-obesity-market/ (last visited on 8/1/23).

55.     In March 2023, it was reported that Eli Lilly kicked off a full-scale consumer campaign for Mounjaro after launching a digital campaign in January, including a 75-second TV spot supporting Mounjaro aired on FOX on February 12, the same day as Super Bowl LVII.[31]

56.     On April 11, 2023, the New York Times reported that Mounjaro was "gaining attention, with many people using it off-label to lose weight." The article described research which "found that Mounjaro may be even more powerful" than Ozempic, which it reported had recently "steamrollered through TikTok, talk shows and tabloids as people raved about using it off-label to lose weight." Although Eli Lilly denied promoting or encouraging "the off-label use of any of our medicines[,]" it was obvious to Eli Lilly and others in the industry that Mounjaro was following Ozempic's rising popularity for its weight loss effects. Furthermore, the same article also noted Eli Lilly's October announcement regarding the FDA's fast-track designation for its review of tirzepatide.[32]

**C.     Defendants Failed to Warn of the Risk of Severe Gastrointestinal Events From Ozempic and Mounjaro**

57.     Gastroparesis is a disorder that slows or stops the movement of food from the stomach to the small intestine, even though there is no blockage in the stomach or intestines. Gastroparesis may also be called delayed gastric emptying.[33]

---

[31] https://www.mmm-online.com/home/channel/campaigns/eli-lilly-kicks-off-consumer-campaign-for-diabetes-drug-mounjaro/ (last visited on 8/1/23).

[32] https://www.nytimes.com/2023/04/11/well/live/ozempic-mounjaro-weight-loss-diabetes.html (last visited on 8/1/23).

[33] https://www.niddk.nih.gov/health-information/digestive-diseases/gastroparesis (last visited on 8/1/23).

11

58.     Gastroenteritis refers to inflammation of the stomach and intestines. Its symptoms include (but are not limited to) vomiting and diarrhea, which can cause dehydration.[34] Gastroenteritis may be caused by ingesting medications.[35]

59.     The Novo Nordisk Defendants' main promotional website for Ozempic (ozempic.com) includes a variety of information about the benefits of Ozempic relating to blood sugar, cardiovascular health and weight loss, as well as "Important Safety Information" – however, Defendants do not disclose any risks associated with severe gastrointestinal events, including gastroparesis and gastroenteritis, within the "Important Safety Information" section of their promotional website.

60.     Similarly, the Prescribing Information discloses warnings, precautions, and adverse reactions associated with Ozempic, but it does not disclose the risk of severe gastrointestinal events, including gastroparesis and gastroenteritis. Instead, it discloses delayed gastric emptying under the "Drug Interaction" heading and notes that Ozempic "may impact absorption of concomitantly administered oral medications." Further, under the "Mechanism of Action" section, the Prescribing Information states that "[t]he mechanism of blood glucose lowering also involves a minor delay in gastric emptying in the early postprandial phase."[36] These statements do not disclose gastroparesis or delayed gastric emptying as *risks* of taking Ozempic, nor do they disclose gastroparesis as a chronic condition that can result as a consequence of taking Ozempic.

---

[34] https://www.mayoclinic.org/diseases-conditions/viral-gastroenteritis/symptoms-causes/syc-20378847 (last visited on 8/1/23).

[35] https://www.merckmanuals.com/home/digestive-disorders/gastroenteritis/drug-related-gastroenteritis-and-chemical-related-gastroenteritis (last visited on 8/1/23).

[36] https://www.novo-pi.com/ozempic.pdf (last visited on 8/1/23).

61.     None of Defendants' additional advertising or promotional materials warned prescription providers or the general public of the risk of severe gastrointestinal events, including gastroparesis and gastroenteritis.

62.     In August of 2020, medical literature advised that some "patients do not know they have diabetic gastroparesis until they are put on a glucagon-like peptide 1 (GLP-1) receptor agonist such as ... semaglutide ... to manage their blood glucose." The article went on to explain that "[t]his class of drugs can exacerbate the symptoms of diabetic gastroparesis. ... Thus, GLP-1 receptor agonist therapy is not recommended for people who experience symptoms of gastroparesis."[37]

63.     In 2021, a case report was published regarding a 52-year-old female who had been taking weekly semaglutide injections approximately one month prior to the onset of gastroparesis symptoms. The case report authors concluded that "thorough history taking revealed the cause [of gastroparesis] to be medication induced."[38]

64.     A second case report also published in 2021 involved a 57-year-old female who had been taking weekly dulaglutide injections (another GLP-1 receptor agonist) for 15 months and suffering from bloating, nausea and vomiting for 12 of those months. Testing revealed delayed gastric emptying which improved with cessation of dulaglutide.[39]

65.     On June 29, 2023, the American Society of Anesthesiologists issued a warning that patients taking Ozempic should stop the medication at least a week before elective surgery because Ozempic and other GLP-1 agonists "delay gastric (stomach) emptying" and "the delay in stomach

---

[37] Young CF, Moussa M, Shubrook JH, *Diabetic Gastroparesis: A Review*, Diabetes Spectr. 2020 Aug; 33(3): 290–297, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7428659/ (last visited on 8/1/23).

[38] Kalas MA, Galura GM, McCallum RW, *Medication-Induced Gastroparesis: A Case Report*, J Investig Med High Impact Case Rep. 2021 Jan-Dec; 9: 23247096211051919, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8529310/ (last visited on 8/1/23).

[39] Kalas MA, Galura GM, McCallum RW, *Medication-Induced Gastroparesis: A Case Report*, J Investig Med High Impact Case Rep. 2021 Jan-Dec; 9: 23247096211051919, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8529310/ (last visited on 8/1/23).

emptying could be associated with an increased risk of regurgitation and aspiration of food into the airways and lungs during general anesthesia and deep sedation."[40]

66.     On July 25, 2023, it was reported that patients taking Ozempic had been diagnosed "with severe gastroparesis, or stomach paralysis, which their doctors think may have resulted from or been exacerbated by the medication they were taking, Ozempic." Additionally, "[t]he US Food and Drug Administration said it has received reports of people on the drugs experiencing stomach paralysis[.]"[41]

67.     From the date the Novo Nordisk Defendants received FDA approval to market Ozempic until the present time, the Novo Nordisk Defendants made, distributed, marketed, and/or sold Ozempic without adequate warning to Plaintiff's prescribing physician(s) and/or Plaintiff that Ozempic was associated with and/or could cause severe gastrointestinal issues including gastroparesis and gastroenteritis.

68.     From the date Eli Lilly received FDA approval to market Mounjaro until the present time, Eli Lilly made, distributed, marketed, and/or sold Mounjaro without adequate warning to Plaintiff's prescribing physician(s) and/or Plaintiff that Mounjaro was associated with and/or could cause severe gastrointestinal issues, including gastroparesis and gastroenteritis.

69.     Upon information and belief, Defendants knew of the association between the use of GLP-1 receptor agonists and the risk of developing severe gastrointestinal issues, including gastroparesis and gastroenteritis. Defendants' knowledge derived from their clinical studies, case reports, and the medical literature, including the medical literature and case reports referenced above in this Complaint.

---

[40] https://www.asahq.org/about-asa/newsroom/news-releases/2023/06/patients-taking-popular-medications-for-diabetes-and-weight-loss-should-stop-before-elective-surgery (last visited on 8/1/23).
[41] https://www.cnn.com/2023/07/25/health/weight-loss-diabetes-drugs-gastroparesis/index.html (last visited on 8/1/23).

70.    Upon information and belief, Defendants ignored the association between the use of GLP-1 receptor agonists and the risk of developing severe gastrointestinal issues, including gastroparesis and gastroenteritis.

71.    Defendants' failure to disclose information that they possessed regarding the association between the use of GLP-1 receptor agonists and the risk of developing severe gastrointestinal issues, including gastroparesis and gastroenteritis, rendered the warnings for this medication inadequate.

72.    By reason of the foregoing acts and omissions, Plaintiff was and still is caused to suffer from severe gastrointestinal issues, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

**FIRST CAUSE OF ACTION**
**(INADEQUATE WARNING UNDER LA. R.S. 9:2800.57 –**
**AGAINST ALL DEFENDANTS)**

73.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

74.    Louisiana law imposes a duty on producers, manufacturers, distributors, lessors, and sellers of a product to exercise all reasonable care when producing, manufacturing, distributing, leasing, and selling their products.

75.    At all times mentioned herein, the Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Ozempic and Mounjaro that were used by the Plaintiff.

15

76. Ozempic and Mounjaro were expected to and did reach the usual consumers, handlers, and persons coming into contact with said products without substantial change in the condition in which they were produced, manufactured, sold, distributed, and marketed by the Defendants.

77. At all relevant times, and at the times Ozempic and Mounjaro left the Defendants' control, Defendants knew or should have known that Ozempic and Mounjaro were unreasonably dangerous because they did not adequately warn of the risks of severe gastrointestinal events, especially when used in the form and manner as provided by Defendants.

78. Despite the fact that Defendants knew or should have known that Ozempic and Mounjaro caused unreasonably dangerous injuries, Defendants continued to market, distribute, and/or sell Ozempic and Mounjaro to consumers, including Plaintiff, without adequate warnings.

79. Despite the fact that Defendants knew or should have known that Ozempic and Mounjaro caused unreasonably dangerous injuries, Defendants continued to market Ozempic and Mounjaro to prescribing physicians, including Plaintiff's prescribing physician(s), without adequate warnings.

80. Defendants knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of their failure to provide adequate warnings, as set forth herein.

81. At all relevant times, given their lack of efficacy and increased safety risks, Ozempic and Mounjaro were not fit for the ordinary purpose for which they were intended— namely, as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

82. At all relevant times, given their lack of efficacy and increased safety risks, Ozempic and Mounjaro did not meet the reasonable expectations of an ordinary consumer, particularly the Plaintiff.

83. Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of Ozempic and Mounjaro into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous injuries, such as severe gastrointestinal events, including gastroparesis and gastroenteritis.

84. At all relevant times, Plaintiff was using Ozempic and Mounjaro for the purposes and in a manner normally intended—namely, as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

85. The Ozempic and Mounjaro designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective due to inadequate warnings or instructions, as the Defendants knew or should have known that the products created a risk of serious and dangerous injuries, including severe gastrointestinal events (e.g., gastroparesis, gastroenteritis), as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to adequately warn of said risk.

86. The Ozempic and Mounjaro designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects, including severe gastrointestinal events (e.g., gastroparesis, gastroenteritis), as well as other severe and permanent health consequences from Ozempic and Mounjaro, they failed to provide adequate warnings to users and/or prescribers of

17

the product, and continued to improperly advertise, market and/or promote their products, Ozempic and Mounjaro.

87. The labels for Ozempic and Mounjaro were inadequate because they did not warn and/or adequately warn of all possible adverse side effects associated with the use of Ozempic and Mounjaro, including the increased risk of severe gastrointestinal events (e.g., gastroparesis, gastroenteritis).

88. The labels for Ozempic and Mounjaro were inadequate because they did not warn and/or adequately warn that Ozempic and Mounjaro had not been sufficiently and/or adequately tested for safety risks, including severe gastrointestinal events (e.g., gastroparesis, gastroenteritis).

89. The labels for Ozempic and Mounjaro were inadequate because they did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Ozempic and Mounjaro.

90. The labels for Ozempic and Mounjaro were inadequate because they did not warn and/or adequately warn of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects.

91. Communications made by Defendants to Plaintiff and her prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn of all possible adverse side effects associated with the use of Ozempic and Mounjaro, including the increased risk of severe gastrointestinal events (e.g., gastroparesis, gastroenteritis).

92. Communications made by Defendants to Plaintiff and her prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn that Ozempic and Mounjaro had not been sufficiently and/or adequately tested for safety risks, including severe gastrointestinal events (e.g., gastroparesis and gastroenteritis).

18

93.     Plaintiff had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and her reliance upon Defendants' warnings was reasonable.

94.     Plaintiff's prescribing physician(s) had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and his/her/their reliance upon Defendants' warnings was reasonable.

95.     Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risk of severe gastrointestinal events (e.g., gastroparesis and gastroenteritis) associated with Ozempic and Mounjaro, he/she/they would not have prescribed Ozempic and Mounjaro and/or would have provided Plaintiff with adequate warnings regarding the dangers of Ozempic and Mounjaro so as to allow Plaintiff to make an informed decision regarding her use of Ozempic and Mounjaro.

96.     Upon information and belief, had Plaintiff's prescribing physician(s) been warned that Ozempic and Mounjaro had not been sufficiently and/or adequately tested for safety risks, including severe gastrointestinal events (e.g., gastroparesis and gastroenteritis), he/she/they would not have prescribed Ozempic and Mounjaro and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Ozempic and Mounjaro so as to allow Plaintiff to make an informed decision regarding her use of Ozempic and Mounjaro.

97.     Had Plaintiff been warned of the increased risk of severe gastrointestinal events (e.g., gastroparesis and gastroenteritis) associated with Ozempic and Mounjaro, she would not have used Ozempic and Mounjaro and/or suffered from severe gastrointestinal events.

98.     Had Plaintiff been warned that Ozempic and Mounjaro had not been sufficiently and/or adequately tested for safety risks, including severe gastrointestinal events (e.g.,

19

gastroparesis and gastroenteritis), she would not have used Ozempic and Mounjaro and/or suffered severe gastrointestinal events.

99. Had Plaintiff been warned of the increased risk of severe gastrointestinal events (e.g., gastroparesis and gastroenteritis) associated with Ozempic and Mounjaro, she would have informed her prescribers that she did not want to take Ozempic or Mounjaro.

100. Upon information and belief, if Plaintiff had informed her prescribing physician(s) that she did not want to take Ozempic or Mounjaro, her prescribing physician(s) would not have prescribed Ozempic and Mounjaro.

101. By reason of the foregoing, Defendants have become liable to the Plaintiff for the designing, marketing, promoting, distribution and/or selling of unreasonably dangerous products, Ozempic and Mounjaro.

102. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendants are therefore liable for the injuries sustained by the Plaintiff in accordance with LA R.S. 9:2800.57.

103. Defendants' inadequate warnings of Ozempic and Mounjaro were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

104. That said inadequate warnings in Defendants' drugs Ozempic and Mounjaro were a substantial factor in causing Plaintiff's injuries.

105. As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous injuries including severe gastrointestinal events, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment,

20

monitoring and/or medications, and fear of developing any of the above-named health consequences.

106.    As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that she will require future medical and/or hospital care, attention, and services.

## SECOND CAUSE OF ACTION
### (BREACH OF EXPRESS WARRANTY UNDER LA. R.S. 9:2800.58 – AGAINST ALL DEFENDANTS)

107.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

108.    At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have acquired the Defendants who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Ozempic and Mounjaro as hereinabove described that was used by Plaintiff.

109.    At all relevant times, Defendants expressly warranted to Plaintiff and her prescribing physician(s) that Ozempic and Mounjaro were safe as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

110.    At all relevant times, Defendants expressly warranted to Plaintiff and her prescribing physician(s) that Ozempic and Mounjaro were effective to use as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

21

111. At all relevant times, Defendants expressly warranted to Plaintiff and her prescribing physician(s) that the effectiveness of Ozempic and Mounjaro outweighed any potential dangers and/or risks.

112. The aforementioned express warranties were made to Plaintiff and Plaintiff's prescribing physician by way of Ozempic's and Mounjaro's labels, websites, advertisements, promotional materials, and through other statements.

113. As a result of Defendants' express warranties to her prescribing physician(s), he/she/they were induced to prescribe Ozempic and Mounjaro to Plaintiff, and Plaintiff was induced to use Ozempic and Mounjaro.

114. At all relevant times, Defendants reasonably anticipated and expected that individuals, such as the Plaintiff, would use and/or consume Ozempic and Mounjaro based upon their express warranties.

115. At all relevant times, Defendants reasonably anticipated and expected that prescribing physicians, such as the Plaintiff's prescribing physician(s), would recommend, prescribe and/or dispense Ozempic and Mounjaro based upon their express warranties.

116. At all relevant times, Defendants knew or should have known that Ozempic and Mounjaro were unreasonably dangerous because of their increased risk of severe gastrointestinal events, especially when the drugs were used in the form and manner as provided by Defendants.

117. At all relevant times, Defendants knew or should have known that Ozempic and Mounjaro were unreasonably dangerous because their safety risks outweighed any efficacy the drugs may have.

118. At all relevant times, Defendants knew or should have known that Ozempic and Mounjaro had not been sufficiently and/or adequately tested for safety.

119.    The unreasonably dangerous characteristics of Ozempic and Mounjaro were beyond that which would be contemplated by the ordinary user, such as Plaintiff, with the ordinary knowledge common to the public as to the drugs' characteristics.

120.    The unreasonably dangerous characteristics of Ozempic and Mounjaro were beyond that which would be contemplated by Plaintiff's prescribing physician(s), with the ordinary knowledge common to prescribing physician as to the drugs' characteristics.

121.    At the time Ozempic and Mounjaro left the Defendants' control, Ozempic and Mounjaro did not conform to Defendants' express warranties because Ozempic and Mounjaro were not safe to use as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus, in that they were associated with an increased risk of severe gastrointestinal events.

122.    The express warranties made by Defendants regarding the safety and efficacy of Ozempic and Mounjaro were made with the intent to induce Plaintiff to use the products and/or her prescribing physician(s) to prescribe the products.

123.    Defendants knew and/or should have known that by making the express warranties to Plaintiff and/or her prescribing physician(s) it would be the natural tendency of Plaintiff to use Ozempic and Mounjaro and/or the natural tendency of her prescribing physician(s) to prescribe Ozempic and Mounjaro.

124.    Plaintiff and her prescribing physician(s), as well as members of the medical community, relied on the express warranties of the Defendants identified herein.

125.    Had Defendants not made these express warranties, Plaintiff would not have used Ozempic and Mounjaro and/or, upon information and belief, her prescribing physician(s) would not have prescribed Ozempic and Mounjaro.

126. Plaintiff's injuries and damages were directly caused by Defendants' breach of the aforementioned express warranties.

127. Plaintiff's injuries and damages arose from a reasonably anticipated use of the products by Plaintiff.

128. Accordingly, Defendants are liable as a result of their breach of express warranties to Plaintiff.

129. As a result of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous injuries including severe gastrointestinal events, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

130. By reason of the foregoing, Plaintiff has been severely and permanently injured and will require more constant and continuous medical monitoring and treatment than prior to Plaintiff's use of Defendants' Ozempic and Mounjaro drugs.

131. As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that she will require future medical and/or hospital care, attention, and services.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff demands judgment against the Defendants on each of the above-referenced claims and Causes of Action and as follows:

1. Awarding compensatory damages to Plaintiff, JACLYN BJORKLUND, for past and future damages, including but not limited to pain and suffering for severe and permanent

personal injuries sustained by the Plaintiff, JACLYN BJORKLUND, health care costs, medical monitoring, together with interest and costs as provided by law;

2.      Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff, JACLYN BJORKLUND, in an amount sufficient to punish Defendants and deter future similar conduct;

3.      Awarding Plaintiff, JACLYN BJORKLUND, reasonable attorneys' fees;

4.      Awarding Plaintiff, JACLYN BJORKLUND, the costs of these proceedings; and

5.      Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Dated: August 2, 2023

By: */s/ Rene F. Rocha*
Rene F. Rocha
Morgan & Morgan
400 Poydras St., Suite 1515
New Orleans, LA 70130
Phone: (954) 318-0268
Facsimile: (954) 327-3018
rrocha@ForThePeople.com

T. Michael Morgan*
Morgan & Morgan
20 North Orange Ave. Suite 1600
Orlando, FL 32801
Phone: (407) 420-1414
Facsimile: (407) 245-2289
mmorgan@forthepeople.com

Paul J. Pennock*
Morgan & Morgan
350 Fifth Ave, Suite 6705
New York, NY 10118
Phone: (212) 738-6839
Facsimile: (407) 245-3384

25

ppennock@forthepeople.com

Jonathan M. Sedgh*
Morgan & Morgan
850 3rd Ave, Suite 402
Brooklyn, NY 11232
Phone: (212) 738-6839
jsedgh@forthepeople.com

Josh Autry*
Morgan & Morgan
333 W. Vine St, St 1200
Lexington, KY 40507
Phone: (859) 899-8785
jautry@forthepeople.com

*Attorneys for Plaintiffs*

*\*Application for admission pro hac vice to
be filed*

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

JACLYN BJORKLUND

## DEFENDANTS

NOVO NORDISK A/S, et al. (see attached complaint)

**(b)** County of Residence of First Listed Plaintiff    Beauregard Parish
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Morgan & Morgan, (954) 318-0268
400 Poydras St., Suite 1515, New Orleans, LA 70130

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### TORTS

**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- [ ] 365 Personal Injury - Product Liability
- [x] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### CIVIL RIGHTS
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

### FORFEITURE/PENALTY
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

### PRISONER PETITIONS
**Habeas Corpus:**
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty
**Other:**
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

### IMMIGRATION
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### INTELLECTUAL PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332

Brief description of cause:
Severe personal injuries caused by use of the drugs Ozempic and Mounjaro

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE    Aug 2, 2023

SIGNATURE OF ATTORNEY OF RECORD    /s/ Rene F. Rocha

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

Case 2:26-cv-03221   Document 1   Filed 05/12/26   Page 45 of 60

12/1/25, 3:24 PM
Case 2:26-cv-03221 Document 1 Filed 05/12/26 Page 46 of 60
They took blockbuster drugs for weight loss and diabetes. Now their stomachs are paralyzed | CNN

**STREAMING NOW**

Murder trial resumes for Brian Walshe who pleaded guilty to disposing his wife's body and misleading police



CNN Health

Subscribe

# They took blockbuster drugs for weight loss and diabetes. Now their stomachs are paralyzed

By Brenda Goodman, CNN

🕐 13 min read · Updated 3:27 PM EDT, Tue July 25, 2023

   

Video Ad Feedback

'Shut the f**k up': Amy Schumer blasts secret celebrity users of Ozempic

00:57 • Source: CNN

---

**See more videos**

---

**(CNN) —** Joanie Knight has a message for anyone considering drugs like Ozempic or Wegovy, which have become popular for the dramatic weight loss they can help people achieve.

"I wish I never touched it. I wish I'd never heard of it in my life," said Knight, 37, of Angie, Louisiana. "This medicine made my life hell. So much hell. It has cost me money. It cost me a lot of stress; it cost me days and nights and trips with my family. It's cost me a lot, and it's not worth it. The price is too high."

Brenda Allen, 42, of Dallas feels the same way. Her doctor prescribed Wegovy for weight loss.

"And even now, being off the medication for almost a year, I'm still having a lot of problems," Allen said. She said she was at urgent care recently after vomiting so much that she became dehydrated.

 Experimental drugs aim to surpass weight-loss stars like Ozempic and Wegovy

---

Emily Wright, 38, a teacher in Toronto, started taking Ozempic in 2018. Over a year, she said, she lost 80 pounds, which she's been able to keep off. But Wright said she now vomits so frequently that she had to take a leave of absence from her job.

"I've almost been off Ozempic for a year, but I'm still not back to my normal," Wright said.

The diabetes drug Ozempic, and its sister drug for weight loss, Wegovy, utilize the same medication, semaglutide. These and other drugs in this family, which includes medications like tirzepatide and liraglutide, work by mimicking a hormone that's naturally made by the body, GLP-1. One of the roles of GLP-1 is to slow the passage of food through the stomach, which helps people feel fuller longer.

If the stomach slows down too much, however, that can cause problems.

Knight and Wright have been diagnosed with severe gastroparesis, or stomach paralysis, which

their doctors think may have resulted from or been exacerbated by the medication they were taking, Ozempic.

Wright said she has also been diagnosed with cyclic vomiting syndrome, which causes her to throw up multiple times a day.



Emily Wright lost 80 pounds on Ozempic and now struggles with gastroparesis Courtesy Emily Wright

Allen doesn't have a diagnosis for her stomach problems but said they started only after she was encouraged by her doctor to take Wegovy to lose weight. She is managing her ongoing nausea and vomiting with a medication called Zofran and prescription probiotics while she waits for more tests in October — the first available appointments she could get with specialists.

Doctors say that more cases like these are coming to light as the popularity of the drugs soared. The US Food and Drug Administration said it has received reports of people on the drugs experiencing stomach paralysis that sometimes has not resolved by the time it's reported.

And last month, the American Society of Anesthesiologists warned that patients should stop these medications a week before surgery because they can increase the risk that people will regurgitate food during an operation, even if they've fasted as directed. Vomiting under anesthesia sometimes causes food and stomach acid to get into the lungs, which can cause pneumonia and other problems after surgery.

So far, extreme and unrelenting cases like these are believed to be rare, and they may be a result of the drug unmasking or worsening an existing "slow stomach." Doctors say people can have a silent condition called delayed gastric emptying and not know it. There's nothing on the drugs' labels that specifically cautions that gastroparesis may occur.



European regulator expands investigation into risks of suicidal thoughts in users of popular weight-loss medications

In response to CNN's request for comment, Novo Nordisk, maker of Ozempic and Wegovy, pointed out that drugs in this class have been used for 15 years to treat diabetes and for eight years to treat obesity, and they have been extensively studied in the real world and in clinical trials.

"Gastrointestinal (GI) events are well-known side effects of the GLP-1 class. For semaglutide, the majority of GI side effects are mild to moderate in severity and of short duration. GLP-1's are

the majority of GI side effects are mild to moderate in severity and of short duration. GLP-1's are known to cause a delay in gastric emptying, as noted in the label of each of our GLP-1 RA medications. Symptoms of delayed gastric emptying, nausea and vomiting are listed as side effects," the statement said.

Gastroparesis can have many causes, including diabetes, which is a reason many people are on these drugs in the first place. Women are known to be at higher risk for the condition, too. In more than half of cases of gastroparesis, doctors are unable to find a cause.

"They may just be really unlucky," said Dr. Michael Camilleri, a gastroenterologist at the Mayo Clinic, said of the people who shared their cases with CNN.

On the other hand, this is how the drugs work, although not many doctors or patients understand this or the problems that may follow, he said.

Camilleri received a grant from the National Institutes of Health to study how one of the first GLP-1 agonists, a drug called liraglutide, affects stomach function.

He recruited 40 obese adults and randomly assigned them to take increasing doses of liraglutide or a placebo, which had no active ingredients.

After five weeks, he had people in the study eat a meal laced with a radioactive tracer so he could see how long food stayed in their stomachs. People taking liraglutide had dramatically slowed digestion compared with those on the placebo; it took about 70 minutes for half the food they ate to leave their stomachs, compared with just four minutes in the placebo group. And that was just the average delay: In some patients on liraglutide, the time it took for half the meal to leave their stomachs was 151 minutes, or more than two and a half hours.

Camilleri said the group taking liraglutide lost weight, and the bigger the delay in food leaving the stomach, the more weight people seemed to lose.

Fortunately, people in the study seemed to adjust to the medication over time. After 16 weeks, people in the group taking liraglutide were clearing about half the food they ate from their stomachs in about 30 minutes, as opposed to seven minutes in the placebo group.  Symptoms of nausea and vomiting seemed to ease, too.

"Unfortunately, there have not been these types of robust studies, and so the whole idea that this class of medications actually delays gastric emptying is not as well recognized," Camilleri said.

"It is conceivable that some patients may have borderline slow gastric emptying and starting one of the GLP-1 agonists may precipitate a full-blown gastroparesis."

12/1/25, 3:24 PM
Case 2:26-cv-03221 - Document 1 - Filed 05/12/26 - Page 50 of 60
They took blockbuster drugs for weight loss and diabetes. Now their stomachs are paralyzed | CNN

## 'How am I throwing up this much?'

Joanie Knight remembers exactly what she ate on her birthday in 2021. She ordered chicken fajitas at one of her favorite restaurants. She ate three skinny French fries and two or three pieces of chicken and then felt panic set in when she couldn't swallow the food.

"It felt like it was stuck in my throat," said Knight, who had been taking Ozempic for two years at that point and was already eating very little every day as a result. Her birthday dinner triggered a bout of violent vomiting.

"I thought, 'I hadn't eaten. How am I throwing up this much?' " she said.

She went to see a gastroenterologist, a doctor who specializes in stomach problems. They put a tube with a camera down her throat and into her stomach to see what the issue might be.

"They said, 'your stomach is full of food,' " she said.

Normally, less than 10% of the food will be left in the stomach four hours after a meal. When that climbs to between 10% and 15%, it's considered mild gastroparesis. Moderate gastroparesis is when 15% to 35% of food is left. Severe gastroparesis is anything over 35% after four hours.

A gastric emptying study — a test that measures how food moves through the stomach — put Knight in the severe category. She said she stayed nauseated all the time, no matter how little she ate, and took a prescription anti-nausea medication "like it was candy."

 Ozempic prescriptions can be easy to get online. Its popularity for weight loss is hurting those who need it most

Still, doctors didn't connect her stomach problems to the Ozempic she was taking. Although the prescription information for the drug warns of nausea and vomiting, it mentions only that the drug causes a delay in stomach emptying as a warning that it might affect the absorption of other medications. It was almost four more months until a specialist took her off the medication.

Emily Wright, the teacher from Toronto, said Ozempic helped her shed about 80 pounds in one year, and she continued to take it to help manage her blood sugar, but she always felt sick. She said she vomited every day but kind of got used to it: She would wake up and throw up, and then her day would get better.

In clinical trials, nearly half of people, 44%, who took Wegovy reported nausea, and almost 1 in

Case 2:26-cv-03221    Document 1    Filed 05/12/26    Page 51 of 60

In clinical trials, nearly half of people, 44%, who took Wegovy reported nausea, and almost 1 in 4 reported vomiting; both are common symptoms of gastroparesis.

In the clinical trials for Ozempic, which is the same medication as Wegovy but given at a lower dose, 1 in 5 people reported nausea and 1 in 10 reported vomiting.

In September 2020, Wright had to be hospitalized for dehydration related to the vomiting, and that prompted her to push her doctors for more answers. A gastric-emptying study showed that she had gastroparesis. Her doctors put her on two more medications to try to help her manage her symptoms but didn't take her off the Ozempic because they didn't suspect it was contributing.

Diabetes can also cause gastroparesis, but that typically happens only in people who have had the disease for at least a decade and have chronically high blood sugars that have damaged the nerves that control the stomach.

Both Knight and Wright say their doctors dismissed that possibility in their cases. "Everybody said there's no way it's diabetes," said Wright, who had been diagnosed with diabetes for only five years when she developed gastroparesis.

In September 2022, her vomiting got much worse. Standing in front of her classroom, Wright said, she began having burps that smelled so strongly of sulfur and rotten eggs that the kids began to comment on it. "What is that? Where is it coming from?" they asked.

Then, instead of just vomiting the food she'd recently eaten, Wright noticed that she was throwing up food she'd eaten three or four days prior.

Another gastric emptying test showed her condition had deteriorated.

 Forget TikTok claims: 'Nature's Ozempic' is no such thing, experts say

"Then the GI doctor said, 'Well, I've been seeing a lot of clients coming in with full stomachs on endoscopy who are on Ozempic. So let's try taking you off the Ozempic,' " Wright said.

Both Knight and Wright said they got some relief after coming off the medication, but their problems continued.

Now, Wright said, instead of throwing up a meal she ate several days ago, she mostly vomits food she has eaten recently.

For people with gastroparesis — from any cause — these stories are the norm. It takes a steep

12/1/25, 3:24 PM

Case 2:26-cv-03221 Document 1 Filed 05/12/26 Page 52 of 60

They took blockbuster drugs for weight loss and diabetes. Now their stomachs are paralyzed | CNN

mental and physical toll on people who live with it.

Knight eventually had stomach bypass surgery. It's similar to the technique used for weight loss, but it can also be a treatment for severe cases of gastroparesis. She said it has allowed her to eat some of her favorite foods again, like a few bites of pizza or chicken.

"Previously, I was on an extreme amount of vitamins because I wasn't eating. Now I can eat enough that I'm not malnourished," Knight said.

Wright said she's just hoping her condition will improve with medications and time.

"We don't know when we're gonna get better. I think that's the hardest part," she said. "Like if you could give me like a year or two years, I would have something to hope for."

## Weighing benefits and risks

Drug regulators say they have received reports of stomach paralysis among patients taking GLP-1 agonist drugs.

"The FDA has received reports of gastroparesis with semaglutide and liraglutide, some of which documented the adverse event as not recovered after discontinuation of the respective product at the time of the report," the agency said in a statement to CNN.

The reports have been submitted through the agency's publicly accessible adverse events tracking system, and the FDA said there's not always enough information in those reports to properly evaluate them.

 Novo Nordisk limits Wegovy doses for new patients as demand outpaces supply

The FDA said it has been unable to determine whether the medications were the cause or if the gastroparesis may have been caused by a different issue.

"Gastroparesis can be a complication of diabetes that is related to long-standing or poorly controlled disease, further complicating the ability to determine what role the drugs played in the reported events," the agency said.

Asked whether doctors and patients should be warned about the risk for people who are know to have slow digestion to begin with, the FDA said the benefits of the medication may still outweigh its risks, even for this group.

12/1/25, 3:24 PM They took blockbuster drugs for weight loss and diabetes. Now their stomachs are paralyzed | CNN

Case 2:26-cv-03221 Document 1 Filed 05/12/26 Page 53 of 60

"Regulations pertaining to drug labeling state that a drug should be contraindicated only in those clinical situations for which the risk from use clearly outweighs any possible therapeutic benefit. Only known hazards, and not theoretical possibilities, can be the basis for a contraindication," the agency said.

The FDA said people with gastroparesis weren't excluded from clinical trials of these medications, and the benefits for diabetes and weight management "may outweigh the risks in some patients with gastroparesis or delayed gastric emptying."

Doctors who are experts in treating gastroparesis say they're hearing more stories like these as greater numbers of people try the drugs.

"Gastroparesis or delayed gastric emptying from the GLP-1 agonists definitely does happen," said Dr. Linda Nguyen, who specializes in the treatment of this condition at Stanford University.

What seems to be unusual about cases like Wright's and Knight's, Nguyen said, is that they didn't improve after they stopped taking the medication.

"In my experience, when you stop the GLP-1 agonist, the gastric emptying improves, and it gets better," said Nguyen, who is also a spokesperson for the American Gastroenterological Association.

## Concern for surgery

Anesthesiologists say there are real hazards involved with stomach paralysis on these medications, and doctors and patients need more information about the risks.

Dr. Renuka George, fellowship director of regional anesthesiology at the Medical University of South Carolina, recently tweeted a photo of the stomach contents suctioned from a patient who had fasted as directed but was taking a GLP-1 agonist for diabetes. The stomach, she said, was basically full, even though the person had followed all the surgical prep instructions to the letter.

George explained that this is a cautionary tale.

"This has become more, I guess, front and center for anesthesiologists, simply because aspiration is a big concern," she said.

 Opinion: Ozempic isn't just a 'wonder drug.' It can also be a warning sign

George explained that the stomach and esophagus can handle the acidic digestive juices that mix with food. Lungs can't.

"Lung tissue is fragile and precious," George said. "If anything goes into the lungs, at best, it's a cough; at worst, you end up on a ventilator for an extended period of time."

She said that as more and more people take these medications, with little information about the stomach slowdown that comes with them, they may not know to tell their doctors.

"The big concern is if we have patients that aren't aware of this and don't tell their anesthesiologists because not everybody wants to advertise that they're on a weight loss drug, right?" she said. "So that becomes a problem because they're not fasted appropriately."

The American Society of Anesthesiologists is advising doctors to have patients stop these medications for one week prior to surgery to prevent aspiration, but President Dr. Michael Champeau said they aren't sure what the right amount of time to fast or stop the drug would be.

"When we issued this guidance, we issued it on very limited scientific evidence," Champeau said. These kinds of studies — on the delay in stomach emptying — just haven't been done, he said.

He said their experts felt that stopping it one week in advance, for people taking it weekly, would be reasonable in the near term.

George said she was aware of ongoing studies to try to learn more about this complication.

---

**GET CNN HEALTH'S WEEKLY NEWSLETTER**

Sign up here to get **The Results Are In with Dr. Sanjay Gupta** every Tuesday from the CNN Health team.

---

"There's a lot of research underway. I have a feeling that we're going to see a lot of publications in the next few years regarding this," she said.

Until more is known, George said, people need to be open with all their doctors about taking any drugs.

Knight, the gastroparesis patient in Louisiana, said people need to carefully consider the risks.

"I accepted that the medicine was working for me. I had a major side effect from it that altered my life course.  Now I feel like my best option is to try to warn people whenever I can," she said.

Case 2:26-cv-03221 Document 1 Filed 05/12/26 Page 55 of 60

Nguyen, the Stanford doctor, said patients need to pay attention to the side effects. If you vomit once or twice, that might be normal, but persistent vomiting is not.

"They should be evaluated. Consider reducing the dose or stopping the medication," she said.

"If your vomiting is affecting your hydration or you are having to take other medications to treat the side effects of this medication, then I think it's time to reconsider."

# Up next

Former Trump personal lawyer Alina Habba is unlawfully serving as the US attorney for New Jersey, appeals court says

3 minute read



Trump's threats bring war with Venezuela closer as contradictions and legal fears mount

8 minute read



Maduro resurfaces in Caracas, as Trump says he has spoken to Venezuelan president

5 minute read



After 'progress' in talks to end Ukraine war, US diplomacy faces Kremlin test

4 minute read



# Most read

**1**   Former Trump personal lawyer Alina Habba is unlawfully serving as the US attorney for New Jersey, appeals court says

**2**   Trump's threats bring war with Venezuela closer as contradictions and legal fears mount

**3**   Maduro resurfaces in Caracas, as Trump says he has spoken to Venezuelan president

▌ **MORE FROM CNN**

Luse Medicube's

Case 2:26-cv-03221 Document 1 Filed 05/12/26 Page 56 of 60



Fuse Medicube's viral skin-boosting tool every day. Here's why I think it's worth every ...



The Beats Pill speaker is finally back — and it's awesome



Investigators race to find the cause of botulism contamination in ByHeart infant ...

## NEWS & BUZZ



Former Trump personal lawyer Alina Habba is unlawfully serving as the US ...



Trump's threats bring war with Venezuela closer as contradictions and legal fears mount



Maduro resurfaces in Caracas, as Trump says he has spoken to Venezuelan ...

Search CNN...

Subscribe

12/1/25, 3:24 PM
Case 2:26-cv-03221 Document 1 Filed 05/12/26 Page 57 of 60

They took blockbuster drugs for weight loss and diabetes. Now their stomachs are paralyzed | CNN

Sign in

Listen

Watch

US

World

Politics

Business

Markets

Health

CNN Underscored

Entertainment

Tech

Style

Travel

Sports

Science

Climate

Weather

Ukraine-Russia War

Israel-Hamas War

Watch

Listen

Games

Cyber Monday Deals

About CNN

12/1/25, 3:24 PM

They took blockbuster drugs for weight loss and diabetes. Now their stomachs are paralyzed | CNN

Case 2:26-cv-03221    Document 1    Filed 05/12/26    Page 58 of 60

# Health

**FOLLOW CNN**



Terms of Use    Privacy Policy    Manage Cookies    Ad Choices    Accessibility & CC    About    Subscribe    Newsletters

Transcripts    Help Center

© 2025 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.

Case 2:26-cv-03221   Document 1   Filed 05/12/26   Page 59 of 60

Case 2:26-cv-03221   Document 1   Filed 05/12/26   Page 60 of 60